Anna T. Neill (State Bar No. 270858)
KENNY NACHWALTER, P.A.
1100 Miami Center
201 South Biscayne Blvd.
Miami, Florida 33131-4327
Telephone:     (305) 373-1000
Facsimile:     (305) 372-1861
Email: aneill@knpa.com
*Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE LIDODERM ANTITRUST LITIGATION | MDL DOCKET NO. 2521<br>Case No. 14-md-2521-WHO |
| WALGREEN CO., THE KROGER CO., SAFEWAY INC., HEB GROCERY COMPANY L.P., and ALBERTSON'S LLC,<br><br>Plaintiffs,<br><br>v.<br><br>ENDO PHARMACEUTICALS INC., TEIKOKU PHARMA USA, TEIKOKU SEIYAKU CO., WATSON PHARMACEUTICALS, INC., and ACTAVIS, PLC,<br><br>Defendants. | No.<br><br>**COMPLAINT AND DEMAND FOR JURY TRIAL** |

Plaintiffs Walgreen Co., The Kroger Co., Safeway Inc., HEB Grocery Company L.P. and

Albertson's LLC (collectively, "Plaintiffs") bring this civil action against Defendants Endo

Pharmaceuticals Inc. ("Endo"), Teikoku Pharma USA ("Teikoku Pharma"), Teikoku Seiyaku Co.

("Teikoku Seiyaku") (collectively "Teikoku") (together, "Endo/Teikoku"), Watson

Pharmaceuticals, Inc., and Actavis, plc, formerly known as Watson Pharmaceuticals, Inc., and

Watson Laboratories, Inc. (collectively "Watson") under the antitrust laws of the United States.

For their Complaint, Plaintiffs allege as follows:

# I.       NATURE OF THE ACTION

1.       This is a civil antitrust action brought by purchasers of a lidocaine patch 5%, sold by Endo under the brand name Lidoderm.  Lidoderm is a lidocaine-containing patch for the treatment of pain associated with post-herpetic neuralgia.  Plaintiffs seek overcharge damages and other relief arising out of Defendants' unlawful foreclosure of generic competition in the market for lidocaine patch 5%.

2.       On May 28, 2012, Endo/Teikoku entered into an unlawful non-competition agreement with Watson.  Under the agreement (the "Reverse Payment Agreement" or "Agreement"), Watson agreed to delay marketing its less-expensive generic version of Lidoderm for almost 13 months, until September 15, 2013.  In exchange, Endo/Teikoku agreed to pay Watson—and did, in fact, pay Watson—(a) at least $96 million in the form of branded Lidoderm provided at no cost to Watson, which Watson could then resell (and did, in fact, resell) at that price; and (b) by forbearing from launching an authorized generic to compete with Watson's generic Lidoderm until 7½ months after Watson's generic belatedly entered the market, effectuating a payment of hundreds of millions of dollars from Endo/Teikoku to Watson.  In compliance with the Agreement, even though Watson was granted final FDA approval to launch its less-expensive generic Lidoderm patch on August 23, 2012, Watson did not come to market until September 15, 2013, thirteen (13) months later.

3.       But for Defendants' unlawful Reverse Payment Agreement, one or more generic versions of Lidoderm would have entered the market as early as August 23, 2012.  Thus, absent Defendants' unlawful Reverse Payment Agreement, Plaintiffs and/or their assignors would have been able to purchase their requirements of lidocaine patch 5% at significantly lower prices substantially earlier than they did, rather than being forced to pay for brand and generic Lidoderm at higher prices because of the unlawful agreement.  Endo has stated in its annual reports that sales of Lidoderm were $825 million in 2011 and $947 million in 2012.

4.       Defendants' unlawful Reverse Payment Agreement was designed to and did in fact:  (i) delay and/or preclude the entry of less-expensive generic versions of lidocaine patch 5%; (ii) delay the introduction of an authorized generic lidocaine patch 5%, which otherwise would

2

have appeared on the market at a significantly earlier time and lowered prices further; (iii) fix, raise, maintain or stabilize the prices of lidocaine patch 5% products; (iv) permit Endo to maintain a monopoly for lidocaine patch 5%; (v) allocate 100% of the lidocaine patch 5% market in the United States, including its territories, possessions and the Commonwealth of Puerto Rico, to Endo for up to 13 months; and (vi) allocate 100% of generic lidocaine patch 5% sales in the United States, including its territories, possessions and the Commonwealth of Puerto Rico, to Watson for 7½ months.

5.     Defendants violated §§ 1 and 2 of the Sherman Act through their anticompetitive Reverse Payment Agreement, which unreasonably restrained competition in the market for lidocaine patch 5% and improperly maintained and extended Endo's market and monopoly power by foreclosing or delaying competition from lower-priced generic versions of lidocaine patch 5%.

## II.     JURISDICTION AND VENUE

6.     This action arises under Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2, and Sections 4 and 16 of the Clayton Act, 15 U.S.C. § 15(a) and § 26, and seeks to recover threefold damages and other relief for the injuries sustained by Plaintiffs resulting from Defendants' unlawful restraint of trade and maintenance of monopoly power in the market for lidocaine patch 5% in the United States.  The Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1337(a).

7.     Defendants transact business within this district, and they carry out interstate trade and commerce in substantial part in this district and/or have an agent and/or can be found in this district.  Defendant Teikoku has a principal place of business in this district.  Venue is therefore appropriate within this district under section 12 of the Clayton Act, 15 U.S.C. § 22, 28 U.S.C. §§ 1391(b) and (c) and 28 U.S.C. § 1407.

## III.     PARTIES

8.     Plaintiff Walgreen Co. ("Walgreen") is an Illinois corporation having its principal place of business at 200 Wilmot Road, Deerfield, Illinois 60015.  Walgreen owns and operates retail stores in several states at which it dispenses prescription drugs to the public, including Lidoderm.  Walgreen brings this action in its own behalf and as the assignee of Cardinal Health,

3

1   Inc. ("Cardinal"), a pharmaceutical wholesaler, which during the relevant period purchased

2   Lidoderm directly from Endo for resale to Walgreen and which has assigned its claim arising out

3   of those purchases to Walgreen. In addition, Walgreen is contractually entitled to a second

4   assignment from AmerisourceBergen Drug Corporation ("ABDC"), another pharmaceutical

5   wholesaler, which during the relevant period purchased Lidoderm directly from Endo for resale to

6   Walgreen. Walgreen intends to include purchases made through ABDC in its damage claim

7   when it obtains that assignment.

8          9.     Plaintiff The Kroger Co. ("Kroger") is an Ohio corporation having its principal

9   place of business at 1014 Vine Street, Cincinnati, Ohio 45202. Kroger owns and operates retail

10  stores in several states at which it dispenses prescription drugs to the public, including Lidoderm.

11  Kroger brings this action in its own behalf and as the assignee of Cardinal, which during the

12  relevant period purchased Lidoderm directly from Endo for resale to Kroger and which has

13  assigned its claims arising out of those purchases to Kroger.

14        10.    Plaintiff Safeway Inc. ("Safeway") is a Delaware corporation having its principal

15  place of business at 5918 Stoneridge Mall Road, Pleasanton, California 94588. Safeway owns

16  and operates retail stores in several states at which it dispenses prescription drugs to the public,

17  including Lidoderm. Safeway brings this action in its own behalf and as the assignee of Cardinal,

18  which during the relevant period purchased Lidoderm directly from Endo for resale to Safeway

19  and which has assigned its claims arising out of those purchases to Safeway.

20        11.    Plaintiff Albertson's LLC ("Alberston's") is a Delaware limited liability company

21  having its principal place of business at 250 Parkcenter Blvd., Boise, Idaho 83706. Albertson's

22  owns and operates retail stores in several states at which it dispenses prescription drugs to the

23  public, including Lidoderm. Albertson's brings this action in its own behalf and as the assignee

24  of McKesson Corporation ("McKesson"), a pharmaceutical wholesaler, which during the relevant

25  period purchased Lidoderm directly from Endo for resale to Albertson's and which has assigned

26  its claim arising out of a portion of those purchases to Albertson's.

27        12.    Plaintiff HEB Grocery Company L.P. ("HEB") is a Texas limited partnership

28  having its principal place of business at 646 South Main Avenue, San Antonio, Texas 78204.

4

1    HEB owns and operates retail stores at which it dispenses prescription drugs to the public,

2    including Lidoderm.  HEB brings this action in its own behalf and as the assignee of Cardinal and

3    McKesson, which during the relevant period purchased Lidoderm directly from Endo for resale to

4    HEB and which have assigned their claims arising out of those purchases to HEB.

5            13.     Defendant Endo is a Delaware corporation having its principal place of business at

6    1400 Atwater Drive, Malvern, Pennsylvania, 19355.  Endo markets and sells Lidoderm

7    throughout the United States.

8            14.     Defendant Teikoku Seiyaku is a company organized and existing under the laws of

9    Japan, having its principal place of business in Higashikagawa, Kagawa, Japan.  Teikoku Seiyaku

10   is the owner, assignee or licensee of U.S. Patent No. 5,827,529 (the "'529 patent") over which

11   Endo and Teikoku sued Watson.  Teikoku Seiyaku manufactures Lidoderm in Japan for

12   commercial sale in the United States by Endo under a Manufacturing and Supply Agreement with

13   Endo.  Endo pays Teikoku Seiyaku royalties under that agreement.

14           15.     Defendant Teikoku Pharma is a California corporation, having its principal place

15   of business at 1718 Ringwood Avenue, San Jose, California, 95131.  Teikoku Pharma is a

16   wholly-owned subsidiary of Teikoku Seiyaku, and is the holder of the New Drug Application for

17   Lidoderm.

18           16.     Defendant Actavis, plc is incorporated under the laws of Ireland, having its

19   principal place of business at 1 Grand Canal Square, Docklands Dublin 2, Ireland.  Actavis, plc

20   also has a place of business at Morris Corporate Center III, 400 Interpace Parkway, Parsippany,

21   New Jersey, 07054.

22           17.     Defendant Watson Pharmaceuticals, Inc. was a Nevada corporation, having its

23   principal place of business at 311 Bonnie Circle, Corona, California, 92880.  As a result of

24   Watson Pharmaceuticals, Inc.'s acquisition of Actavis Group in or around October 2012, effective

25   on or about January 24, 2013, Watson Pharmaceuticals, Inc. changed its name to Actavis, Inc.

26   Actavis, Inc. changed its name to Actavis, plc on or about October 1, 2013.

27           18.     Defendant Watson Laboratories, Inc. is a Nevada corporation, having its principal

28   place of business at Morris Corporate Center III, 400 Interpace Parkway, Parsippany, New Jersey

                                                        5

1    07054. Defendant Watson Laboratories, Inc. was a wholly-owned subsidiary of Watson

2    Pharmaceuticals, Inc. and is now a subsidiary of Actavis, plc.

3         19.    Watson was and is engaged in marketing, production and distribution of generic

4    pharmaceutical products, including through its wholly-owned wholesaler affiliates including

5    Anda, Inc., Anda Pharmaceuticals, Inc., and Valmed Pharmaceuticals, Inc.

6         20.    All of Defendants' actions described in this complaint are part of, and in

7    furtherance of, the unlawful conduct alleged herein, and were authorized, ordered, and/or done by

8    Defendants' various officers, agents, employees, or other representatives while actively engaged

9    in the management of Defendants' affairs (or that of their predecessors-in-interest) within the

10   course and scope of their duties and employment, and/or with the actual, apparent, and/or

11   ostensible authority of Defendants.

12        21.    With respect to all of the conduct complained of below, Endo at all relevant times

13   acted in concert with its supplier Teikoku. Moreover, Endo, Teikoku Pharma, and Teikoku

14   Seiyaku each signed the Reverse Payment Agreement with Watson. Furthermore, Endo, Teikoku

15   Pharma, and Teikoku Seiyaku at all relevant times acted as a single entity with respect to the

16   material provisions and performance of the Reverse Payment Agreement, which refers to Endo,

17   Teikoku Pharma, and Teikoku Seiyaku collectively in provisions relating to the grant of patent

18   licenses to Watson, the agreement not to launch a competing authorized generic for 7½ months,

19   and the obligation to deliver free Lidoderm product to pay Watson.

20        22.    As the manufacturer and supplier of Lidoderm to Endo, and as Endo's partner in a

21   joint marketing enterprise relating to the distribution and marketing of Lidoderm in the United

22   States, Teikoku had a financial interest in assisting Endo to maintain its monopoly power by

23   foreclosing and delaying competition from lower-priced generic versions of lidocaine patch 5%.

24                 **IV.    REGULATORY BACKGROUND**

25        **A.    Characteristics of the Prescription Pharmaceutical Marketplace.**

26        23.    The marketplace for the sale of prescription pharmaceutical products in the United

27   States suffers from a significant imperfection that brand manufacturers can exploit in order to

28   obtain or maintain market power in the sale of a particular pharmaceutical composition. Markets

6

function best when the person responsible for paying for a product is also the person who chooses which product to purchase. When the same person has both the payment obligation and the choice of products, the price of the product plays an appropriate role in the person's choice of products and, consequently, the manufacturers have an appropriate incentive to lower the prices of their products.

24.     The pharmaceutical marketplace, however, is characterized by a "disconnect" between the payment obligation and the product selection. State laws prohibit pharmacists from dispensing many pharmaceutical products, including Lidoderm, to patients without a prescription written by a doctor. The prohibition on dispensing certain products without a prescription introduces a disconnect between the payment obligation and the product selection. The patient (and in most cases his or her insurer) has the obligation to pay for the pharmaceutical product, but the patient's doctor chooses which product the patient will buy.

25.     Endo/Teikoku and other brand pharmaceutical sellers exploit this price disconnect by employing large forces of sales representatives to visit doctors' offices and persuade them to prescribe the manufacturer's products. These sales representatives do not advise doctors of the cost of the branded products. Moreover, studies show that doctors typically are not aware of the relative costs of brand pharmaceuticals and, even when they are aware of the relative costs, they are insensitive to price differences because they do not have to pay for the products. The result is a marketplace in which price plays a comparatively unimportant role in product selection.

26.     The relative unimportance of price in the pharmaceutical marketplace reduces what economists call the price elasticity of demand – the extent to which unit sales go down when price goes up. This reduced price elasticity in turn gives brand manufacturers the ability to raise price substantially above marginal cost without losing so many sales as to make the price increase unprofitable. The ability to profitably raise price substantially above marginal cost is what economists and antitrust courts refer to as market power. The result of the market imperfections and marketing practices described above is to allow brand manufacturers to gain and maintain market power with respect to many branded prescription pharmaceuticals.

COMPLAINT AND DEMAND FOR JURY TRIAL

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**B.** **The Regulatory Structure for Approval of Generic Drugs and the Substitution of Generic Drugs for Brand Name Drugs.**

27.    Under the Federal Food, Drug, and Cosmetic Act ("FDCA"), manufacturers that create a new drug must obtain FDA approval to sell the product by filing a New Drug Application ("NDA"). 21 U.S.C. §§ 301-392. An NDA must include specific data concerning the safety and effectiveness of the drug, as well as any information on applicable patents. 21 U.S.C. § 355(a), (b).

28.    When the FDA approves a brand manufacturer's NDA, the drug product is listed in an FDA publication entitled Approved Drug Products with Therapeutic Equivalence Evaluations, commonly known as the "Orange Book." The manufacturer may list in the Orange Book any patents that the manufacturer believes could reasonably be asserted against a generic manufacturer that makes, uses, or sells a generic version of the brand drug before the expiration of the listed patents. The manufacturer may subsequently list in the Orange Book within thirty days of issuance any such patents issued after the FDA approves the NDA. 21 U.S.C. §§ 355(b)(1) & (c)(2).

29.    The FDA relies completely on the brand manufacturer's truthfulness about patent validity and applicability, as it does not have the resources or authority to verify the manufacturer's patents for accuracy or trustworthiness. In listing patents in the Orange Book, the FDA merely performs a ministerial act.

**C.** **The Hatch-Waxman Amendments.**

30.    The Hatch-Waxman Amendments, enacted in 1984, simplified the regulatory hurdles for prospective generic manufacturers by eliminating the need for them to file lengthy and costly NDAs. See Drug Price Competition and Patent Term Restoration Act, Pub. L. No. 98-417, 98 Stat. 1585 (1984). A manufacturer seeking approval to sell a generic version of a brand drug may instead file an Abbreviated New Drug Application ("ANDA"). An ANDA relies on the scientific findings of safety and effectiveness included in the brand manufacturer's original NDA, and must further show that the generic drug contains the same active ingredient(s), dosage form, route of administration, and strength as the brand drug, and is absorbed at the same rate and to the

same extent as the brand drug—that is, that the generic drug is pharmaceutically equivalent and bioequivalent (together, "therapeutically equivalent") to the brand drug.  The FDA assigns generic drugs that are therapeutically equivalent to their brand-name counterpart an "AB" rating.

31.     The FDCA and Hatch-Waxman Amendments operate on the presumption that bioequivalent drug products containing identical amounts of the same active ingredients, having the same route of administration and dosage form, and meeting applicable standards of strength, quality, purity and identity, are therapeutically equivalent and may be substituted for one another. Bioequivalence demonstrates that the active ingredient of the proposed generic drug would be present in the blood of a patient to the same extent and for the same amount of time as the branded counterpart.  21 U.S.C. § 355(j)(8)(B).

32.     Congress enacted the Hatch-Waxman Amendments to expedite the entry of legitimate (non-infringing) generic competitors, thereby reducing healthcare expenses nationwide.  Congress also sought to protect pharmaceutical manufacturers' incentives to create new and innovative products.

33.     The Hatch-Waxman Amendments achieved both goals, advancing substantially the rate of generic product launches, and ushering in an era of historic high profit margins for brand manufacturers.  In 1983, before the Hatch-Waxman Amendments, only 35% of the top-selling drugs with expired patents had generic alternatives; by 1998, nearly all did.  In 1984, prescription drug revenue for branded and generic drugs totaled $21.6 billion; by 2009 total prescription drug revenue had soared to $300 billion.

**D.      Paragraph IV Certifications.**

34.     To obtain FDA approval of an ANDA, a manufacturer must certify that the generic drug will not infringe any patents listed in the Orange Book.  Under the Hatch-Waxman Amendments, a generic manufacturer's ANDA must contain one of four certifications:

i.      that no patent for the brand drug has been filed with the FDA (a "Paragraph I certification");

ii.     that the patent for the brand drug has expired (a "Paragraph II certification");

iii.    that the patent for the brand drug will expire on a particular date and the

9

1  manufacturer does not seek to market its generic product before that date (a "Paragraph III

2  certification"); or

3      iv.    that the patent for the brand drug is invalid or will not be infringed by the generic

4  manufacturer's proposed product (a "Paragraph IV certification").

5      35.    If a generic manufacturer files a Paragraph IV certification, a brand manufacturer

6  can delay FDA approval of the ANDA simply by suing the ANDA applicant for patent

7  infringement.  If the brand manufacturer initiates a patent infringement action against the generic

8  filer within forty-five days of receiving notification of the Paragraph IV certification ("Paragraph

9  IV Litigation"), the FDA will not grant final approval to the ANDA until the earlier of (a) the

10  passage of 30 months, or (b) the issuance of a decision by a court that the patent is invalid or not

11  infringed by the generic manufacturer's ANDA.  Until one of those conditions occurs, the FDA

12  may grant "tentative approval," but cannot authorize the generic manufacturer to market its

13  product.  The FDA may grant an ANDA tentative approval when it determines that the ANDA

14  would otherwise be ready for final approval but for the 30-month stay.

15      36.    As an incentive to spur manufacturers to seek approval of generic alternatives to

16  branded drugs, the first generic manufacturer to file an ANDA containing a Paragraph IV

17  certification typically gets a period of protection from competition from other generic versions of

18  the drug.  For Paragraph IV certifications made after December 2003, the first generic applicant

19  receives 180 days of market exclusivity (unless some forfeiture event, like that discussed below,

20  occurs).  This means that the first approved generic is the only available generic for at least six

21  months, which effectively creates a duopoly between the brand company and the first-filing

22  generic during this period.  This 180-day exclusivity period is extremely valuable to generic

23  companies.  While only one generic is on the market, the generic price, while lower than the

24  branded price, is much higher than after multiple generic competitors enter the market.  Generics

25  are usually at least 25% less expensive than their brand name counterparts when there is a single

26  generic competitor, but this discount typically increases to 50% to 80% (or more) when there are

27  multiple generic competitors on the market.  Being able to sell at the higher duopoly price for six

28  months may be worth hundreds of millions of dollars.

COMPLAINT AND DEMAND FOR JURY TRIAL

37. Brand manufacturers can "game the system" by listing patents in the Orange Book (even if such patents are not eligible for listing) and suing any generic competitor that files an ANDA with a Paragraph IV certification (even if the competitor's product does not actually infringe the listed patents) in order to delay final FDA approval of an ANDA for up to 30 months. That brand manufacturers often sue generics under Hatch-Waxman simply to delay generic competition—as opposed to enforcing a valid patent that is actually infringed by the generic—is demonstrated by the fact that generic firms have prevailed in Paragraph IV litigation, by obtaining a judgment of invalidity or non-infringement or by the patent holder's voluntary dismissal, in cases involving 73% of the drug products studied.

38. The first generic applicant can help the brand manufacturer "game the system" by delaying not only its own market entry, but also the market entry of all other generic manufacturers. The first generic applicant, by agreeing not to begin marketing its generic drug, thereby delays the start of the 180-day period of generic market exclusivity, a tactic called exclusivity "parking." This tactic creates a "bottleneck" because later generic applicants cannot launch until the first generic applicant's 180-day exclusivity has elapsed or is forfeited.

39. On December 8, 2003, Congress enacted the Medicare Prescription Drug, Improvement, and Modernization Act of 2003 ("MMA") in order to make it more difficult for brand and generic manufacturers to conspire in order to delay the start of the first-filer's 180-day period of generic market exclusivity. The MMA outlines a number of conditions under which an ANDA applicant forfeits its eligibility for 180-day exclusivity, making way for other ANDA filers to launch their generic products. For example, forfeiture occurs if the first ANDA applicant fails to obtain tentative approval from the FDA within 30 months from filing a substantially complete ANDA, unless the failure is caused by a change in or review of the approval requirements. Forfeiture under the MMA most commonly occurs for failure to obtain tentative approval within the requisite 30 months.

40. Under the "failure to market" provision, a first ANDA applicant forfeits 180- day exclusivity if it fails to market its generic drug by the later of: (a) the earlier of the date that is (i) 75 days after receiving final FDA approval; or (ii) 30 months after the date it submitted its

11

1    ANDA; or (b) the date that is 75 days after the date as of which, as to each of the patents that

2    qualified the first applicant for exclusivity (i.e., as to each patent for which the first applicant

3    submitted a Paragraph IV certification), at least one of the following has occurred: (i) a final

4    decision of invalidity or non-infringement; (ii) a settlement order entering final judgment that

5    includes a finding that the patent is invalid or not infringed; or (iii) the NDA holder delists the

6    patent from the Orange Book.

7            41.     Brand manufacturers and first-filing generics can structure their settlements in

8    order to intentionally skirt these forfeiture provisions.  For example, manufacturers subvert the

9    failure-to-market provisions and keep the 180-day exclusivity bottleneck in place by, for

10   example, settling their litigation before a final judgment of invalidity or non-infringement can be

11   entered with respect to each of the patents for which the first applicant submitted a Paragraph IV

12   certification, or seeking a consent judgment that does not include a finding that all of the patents

13   for which the first applicant submitted a Paragraph IV certification were invalid or not infringed.

14   When that happens, in order to trigger forfeiture and gain access to the market, subsequent

15   ANDA applicants are forced to obtain a judgment that all patents for which the first filing generic

16   company filed Paragraph IV certifications are invalid or not infringed. This may require the

17   subsequent ANDA applicant to initiate a declaratory judgment action concerning patents that the

18   brand manufacturer did not assert against it in a Paragraph IV litigation.

19           42.     In addition, brand and generic manufacturers can structure their settlements in a

20   way that grants 180 days of exclusivity to the generic even where it is likely that the generic has

21   forfeited that exclusivity under one of the applicable MMA forfeiture provisions, e.g., the failure

22   to obtain tentative approval within 30 months of submitting a substantially complete ANDA.

23   This results in a windfall to the generic and a subversion of the regulatory scheme.  Because the

24   FDA will not typically make a formal 180-day exclusivity determination until another generic

25   applicant has received final approval and is ready to launch, settlements that retain de facto

26   exclusivity – even where it should be forfeited de jure under the MMA – dissuade subsequent

27   generic applicants from trying to obtain a court judgment of invalidity and/or infringement that

28   would trigger the start of the 180 day period.  And, because the lion's share of the generic

1  revenues will perceivably go to the first filer, subsequent filers have less incentive to litigate to

2  judgment.

3  **E.      The Benefits of Generic Drugs.**

4  43.    Generic versions of brand name drugs contain the same active ingredient, and are

5  determined by the FDA to be just as safe and effective, as their brand name counterparts.  The

6  only material difference between generic and brand name drugs is their price: generics are usually

7  at least 25% less expensive than their brand name counterparts when there is a single generic

8  competitor, and this discount typically increases to 50% to 80% (or more) when there are multiple

9  generic competitors on the market for a given brand.  The launch of a generic drug thus usually

10  brings huge cost savings for all drug purchasers.  The Federal Trade Commission ("FTC")

11  estimates that about one year after market entry, the generic version takes over 90% of the

12  brand's unit sales and sells for 15% of the price of the brand name product.  As a result,

13  competition from generic drugs is viewed by brand name drug companies such as Endo/Teikoku

14  as a grave threat to their bottom lines.

15  44.    Due to the price differentials between brand and generic drugs, and other

16  institutional features of the pharmaceutical industry, pharmacists liberally and substantially

17  substitute for the generic version when presented with a prescription for the brand-name

18  counterpart.  Since passage of the Hatch-Waxman Amendments, every state has adopted

19  substitution laws that either require or permit pharmacies to substitute generic equivalents for

20  branded prescriptions (unless the prescribing physician has specifically ordered otherwise by

21  writing  "dispense as written" or similar language on the prescription).

22  45.    There is an incentive to choose the less expensive generic equivalent in every link

23  in the prescription drug chain.  Pharmaceutical wholesalers and retailers pay lower prices to

24  acquire generic drugs than to acquire the corresponding brand-name drug.  Health insurers and

25  patients also benefit from the lower prices that result from generic competition.

26  46.    Generic competition enables Plaintiffs and/or their assignors to purchase generic

27  versions of the drug at substantially lower prices.

28  47.    Until a generic version of the brand drug enters the market, however, there is no

13

1   bioequivalent generic drug to substitute for and compete with the brand drug, and therefore the

2   brand manufacturer can continue to profitably charge supracompetitive prices without losing

3   substantial sales.  As a result, brand manufacturers, who are well aware of generics' rapid erosion

4   of their brand sales, have a strong incentive to delay the introduction of generic competition into

5   the market, including by using tactics such as the Agreements at issue here.

6              **F.      The Impact of Authorized Generics.**

7              48.     The 180-day marketing exclusivity to which first-filer generics may be entitled

8   does not prevent a brand manufacturer from marketing its own generic alternative to the brand

9   drug during that 180-day period.  Such an "authorized generic" is chemically identical to the

10  brand drug, but is sold as a generic product through either the brand manufacturer's subsidiary (if

11  it has one) or through a third-party generic manufacturer.   Competition from an authorized

12  generic during the 180-day exclusivity period substantially reduces the first-filer's revenue, and

13  substantially reduces drug prices for consumers.

14             49.     In its study, Authorized Generic Drugs: Short-term Effects and Long-Term Impact

15  (August 2011) (the "FTC Study"), the Federal Trade Commission found that authorized generics

16  capture a significant portion of sales, reducing the first-filer generic's revenues by approximately

17  50% on average during the 180-day exclusivity period.  The first-filing generic makes

18  significantly less money when it faces competition from an authorized generic because (1) the

19  authorized generic takes a large share of unit sales away from the first-filer; and (2) the presence

20  of an additional generic in the market causes prices to decrease.

21             50.     Although first-filing generic manufacturers make significantly less money when

22  they must compete with an authorized generic during the first 180 days, consumers and other

23  drug purchasers such as Plaintiffs benefit from the lower prices caused by competition between

24  the authorized generic and the first-filing generic.

25             51.     As a practical matter, authorized generics are the only means by which brand-

26  name manufacturers engage in price competition with manufacturers of AB-rated generic drugs.

27  Brand-name manufacturers generally do not reduce the price of their branded drug in response to

28  the entry of an AB-rated generic.  Instead, they either raise the price to extract higher prices from

14

1   the small number of "brand-loyal" patients or, more typically, they continue to raise the price of

2   the branded drug at the same intervals and at the same rate at which they raised the price of the

3   drug prior to generic entry.

4       52.    Given the significant negative impact of an authorized generic on the first-filing

5   generic's revenues, a brand manufacturer's agreement not to launch an authorized generic has

6   tremendous value to the generic manufacturer. Brand manufacturers have used such agreements

7   as a way to pay the first-filer to delay entering the market. Such non-competition agreements

8   deprive consumers and other drug purchasers such as Plaintiffs of the lower prices resulting from

9   two forms of competition: (1) among the branded and the generic products; and (2) between the

10   generic products.

11            **V.     FACTUAL ALLEGATIONS**

12     **A.    Background**

13         **1.    Approval of Brand Lidoderm and its Purported Patent Protection**

14       53.    Lidoderm is a prescription lidocaine-containing patch approved to treat pain

15   associated with post-herpetic neuralgia. The active ingredient in Lidoderm is 5% lidocaine.

16   While other drugs are available to treat the same or similar medical conditions, they are not AB-

17   rated to Lidoderm, cannot be automatically substituted for Lidoderm by pharmacists, do not

18   exhibit substantial cross-price elasticity of demand with respect to Lidoderm, and are not

19   economic substitutes for, nor reasonably interchangeable with, Lidoderm.

20          **a.    Initial Approval of Lidoderm**

21       54.    On March 19, 1999, FDA approved NDA 200612, submitted by Hind Health Care,

22   Inc. ("Hind"), which sought to market an adhesive patch containing 5% lidocaine under the brand

23   name Lidoderm. Lidoderm was awarded Orphan Drug Exclusivity by FDA, meaning that no

24   generic competitor could get FDA approval to market a generic Lidoderm product until March

25   2006.

26       55.    In 1998, Hind granted to Endo the exclusive right to market and distribute

27   Lidoderm in the United States. Hind subsequently transferred full ownership of and

28   responsibility for the Lidoderm NDA to Teikoku, effective June 1, 1999. Teikoku then granted

Endo the exclusive right to market and distribute the Lidoderm patch in the United States under Teikoku's NDA, and Endo launched Lidoderm in the United States in 1999.

**b.      Endo/Teikoku's Acquisition of the Lidoderm Patents**

56.      Endo/Teikoku owned or obtained assignments of or licenses to a number of patents associated with Lidoderm.  Subsequently, Teikoku listed several patents in the Orange Book as covering Lidoderm.  As of January 2010 (after Watson had filed ANDA No. 200675, the first ANDA filed as to Lidoderm), Teikoku had three patents listed in the Orange Book.

57.      The first was U.S. Patent No. 5,411,738 (the "'738 patent"), which is a method of use patent for treating certain types of pain with lidocaine using a topical delivery mechanism and a gel formulation of lidocaine.  The second was U.S. Patent No. 5,601,838 ("the '838 patent"), which is a method of use patent for treating certain types of pain with lidocaine.  The '738 and '838 patents both were assigned to Hind, both expired on May 2, 2012, and are referred to collectively as the "Hind patents."

58.      The third patent that Teikoku listed in the Orange Book as covering Lidoderm was U.S. Patent No. 5,827,529 (the "'529 patent"), which is a formulation patent for a lidocaine patch. This patent was assigned to Teikoku, and is set to expire on October 17, 2015.  Endo is the exclusive licensee of the '529 patent.

59.      The '529 patent, titled "External Preparation for Application to the Skin Containing Lidocaine," issued on October 27, 1998, from an application filed on June 10, 1994. That application was a continuation of an application filed on March 30, 1992.

60.      The '529 patent claims foreign priority to Japanese Application No. 3- 067353, filed March 30, 1991.

61.      The '529 patent contains six claims directed generally to a hydrogel transdermal patch containing the active ingredient lidocaine and inactive ingredients or excipients.

62.      Claim 1 of the '529 patent claims a patch comprising "a drug-retaining layer placed on a support," in which the drug-retaining layer comprises an "adhesive gel base and 1 to 10% by weight of lidocaine."  The claimed "adhesive gel base" consists of three components within specific percentage weight ranges:  (i) "0.5 to 50% by weight of a water-soluble high

16

1   molecular weight substance"; (ii) "30 to 70% by weight of water"; and (iii) "1 to 70% by weight
2   of a water-retaining agent."

3              **c.      Endo/Teikoku Seek to Bolster Lidoderm's Patent Coverage**

4        63.      Endo subsequently obtained additional patents from LecTec Corporation
5   ("LecTec") that it and Teikoku claim cover Lidoderm.  In July 2008, LecTec had filed patent
6   infringement litigation against Endo and other manufacturers of medicinal patch products in the
7   United States District Court for the Eastern District of Texas (the "LecTec Litigation") over U.S.
8   Patent No. 5,536,263 (the "'263 patent"), and U.S. Patent No. 5,741,510 (the "'510 patent"), both
9   of which are patents for a medicinal adhesive patch.  Each of these patents expired on March 30,
10  2014.

11       64.      Endo settled the litigation with LecTec in November 2009, paying LecTec $23
12  million in exchange for exclusive licenses to the '263 and the '510 patents for use in the field of
13  prescription pain medications and treatment.

14       65.      Almost a year later, in or about October 2010, Endo granted Teikoku a sublicense
15  under the '510 patent to make and sell prescription pain medications that contain 5% lidocaine in
16  patch dosage form, including Lidoderm.

17       66.      In or about November 2010, Teikoku submitted the '510 patent to FDA for listing
18  in the Orange Book with respect to Lidoderm.

19       67.      As of January 2011, Endo/Teikoku had four patents listed in the Orange Book
20  related to Lidoderm:  the two Hind patents (which expired in May 2012), the '529 patent, and the
21  '510 patent.

22       68.      In or about May 2011, in exchange for $2 million, Endo acquired from LecTec full
23  title to the '263 patent, the '510 patent and three other patents.  The three other patents were U.S.
24  Patent No. 6,096,333 (the "'333 patent"), (ii) U.S. Patent No. 6,096,334 (the "'334 patent"); and
25  (iii) U.S. Patent No. 6,361,790 (the "'790 patent") (collectively with the '263 and the '510
26  patents, "the Rolf patents," named for one of the inventors).  These three patents all cover
27  methods of formulating a medicinal adhesive patch and expired on March 30, 2014.  Other than
28  the '510 patent, none of the Rolf patents was listed in the Orange Book with respect to Lidoderm.

17

### 2.    Watson's ANDA Threatens Endo/Teikoku's Weak Patents

69.    On November 13, 2009, Watson submitted ANDA No. 200675 to FDA, seeking to market a generic version of Lidoderm.  On or about January 14, 2010, Watson notified Teikoku of its November 13, 2009 ANDA filing.

70.    Watson's notice letter included a Paragraph IV certification that the commercial manufacture, use and/or sale of its generic Lidoderm product would not infringe any claim of the '529 patent, and/or that the '529 patent was invalid and/or unenforceable.  Watson was the first generic manufacturer to file an ANDA with a Paragraph IV certification with respect to Lidoderm, potentially entitling it to a six-month exclusivity period, free from competition from any other ANDA-filing generic company.  This exclusivity, however, would not have protected Watson from competition from an authorized generic version of Lidoderm.

71.    Watson did not submit Paragraph IV certifications as to the Hind patents, which were to expire on May 2, 2012.  As a result, FDA could not approve Watson's ANDA for generic Lidoderm until the Hind patents expired on May 2, 2012.

72.    Watson made no certification to any of the Rolf patents because the Rolf patents were not listed in the Orange Book until November 2010, a year after Watson filed its ANDA.

73.    FDA granted final approval to Watson's ANDA on August 23, 2012, but Watson did not launch its approved generic Lidoderm product until September 16, 2013, because of the unlawful Reverse Payment Agreement with Endo/Teikoku (described in more detail below).  No patents asserted, or capable of being asserted, by Endo/Teikoku would or could have prevented Watson from launching its approved generic Lidoderm product.

### 3.    Endo and Teikoku Scramble to Protect Their Franchise

74.    On February 19, 2010, Endo/Teikoku sued Watson in the United States District Court for the District of Delaware (*Endo Pharm. Inc., et al., v. Watson Labs., Inc.*, Civil Action No. 10-cv-00138-GMS), alleging that Watson's generic Lidoderm infringed the '529 patent (the "'529 Litigation").  As a result of the filing of the '529 Litigation, a 30-month Hatch-Waxman stay of FDA approval applied to Watson's ANDA, which precluded FDA from approving

COMPLAINT AND DEMAND FOR JURY TRIAL

Watson's ANDA until (i) that stay expired in mid-July of 2012, or (ii) entry of a final judgment that the '529 patent was invalid, unenforceable, and/or not infringed.

75.     Watson raised numerous defenses, including that the '529 patent was invalid and/or unenforceable.

76.     As the '529 Litigation moved toward trial, Endo/Teikoku filed yet another suit against Watson, this time using the Rolf patents.  On or about June 29, 2011, Endo filed suit against Watson in the United States District Court for the District of Delaware (*Endo Pharm. Inc. v. Watson Labs.*, Inc., Civil Action No. 11-cv-00575-GMS) (the "Rolf Patent Litigation"), alleging that Watson's generic Lidoderm product would infringe three of the Rolf patents – the '333 patent, the '334 patent, and the '510 patent.  Only the '510 patent had been listed in the Orange Book.  Because the Rolf patents had not been listed in the Orange Book when Watson filed its ANDA, the Rolf Patent litigation did not result in a 30-month Hatch-Waxman stay.

### a.     The '529 Litigation Exposed the Weakness of Endo/Teikoku's '529 Patent

77.     After the June 27, 2011 *Markman* hearing in the '529 Litigation, Judge Sleet rejected Endo's claim construction position, strengthening Watson's defense to Endo/Teikoku's infringement claims.  The '529 Litigation then proceeded to a bench trial in February 2012, in which Watson presented evidence of the invalidity of the '529 patent, as well as evidence that Watson's generic did not infringe the patent.  The evidence at trial was overwhelmingly in favor of Watson, exposing the '529 patent to a determination that it was invalid or unenforceable and that the patent did not cover either the brand product or Watson's generic product.

78.     The evidence developed during the '529 Litigation revealed that the same hydrogel transdermal patch technology claimed in the '529 patent had previously been disclosed in multiple pieces of prior art that were not disclosed to the patent examiner, but were well known to Endo/Teikoku (the "Teikoku Prior Art").  Each of the pieces of Teikoku Prior Art discloses a hydrogel transdermal patch formulation substantially similar to that claimed in the '529 patent.

79.     Each piece of the Teikoku Prior Art discloses an "adhesive gel base" consisting of (i) a water-soluble high molecular weight substance; (ii) water; and (iii) a water-retaining agent,

all of which fall within the percentage ranges claimed in the '529 patent.  Each shares at least one

inventor with the '529 patent, and also shares the same applicant, prosecuting attorneys, or

assignee with the '529 patent.

80.     During the prosecution of the '529 patent, the PTO rejected the patent four times,

noting that because lidocaine was conventionally used in transdermal patches, it would have been

obvious to place lidocaine into available prior art patches.  The applicants consistently

distinguished other prior art patches cited by the Examiner, arguing that the patch in the '529

patent was "unique."  The applicants never disclosed the Teikoku Prior Art to the PTO, or a prior

art patent with the same elements as the '529 patent, which would have showed that the patch

technology in the '529 patent was not unique, and in fact had been previously patented.  The PTO

never cited the Teikoku Prior Art.

81.     Each of these prior art references is prior art to the '529 patent because each was

publicly available and accessible more than one year before the March 30, 1991 priority date of

the '529 patent.  Each of the prior art references predates the priority date of the '529 patent by

over a year, and thus invalidates the '529 patent.  The '529 patent was not capable of preventing

Watson from launching its approved generic Lidoderm product.

82.     In addition, the '529 patent did not cover Lidoderm and was not infringed by

Watson's generic equivalent.  The patch formulation disclosed in the '529 patent included a

water-soluble high-molecular-weight substance, water, and a water-retaining agent.  The water-

soluble high-molecular-weight substance and the water-retaining agent must be from the groups

listed in the patent.  The groups listed in the '529 patent are known as Markush groups.  "A

Markush group is a listing of specified alternatives of a group in a patent claim, typically

expressed in the form:  a member selected from the group consisting of A, B, and C."  *Endo

Pharm. Inc., et al., v. Watson Labs., Inc.*, slip op. at 1 n.1, No. 10-138 (GMS) (D. Del. June 27,

2011) (quoting *Abbott Labs. v. Baxter Pharm. Prods*., 334 F.3d 1274, 1280 (Fed. Cir. 2003)).

83.     In the '529 patent, the first Markush group related to "a water-soluble high

molecular weight substance selected from the group consisting of gelatin, starch, agar, mannan,

alginic acid, polyacrylic acid, a salt of polyacrylic acid, dextrin, methylcellulose, methylcellulose

COMPLAINT AND DEMAND FOR JURY TRIAL

1  sodium, carboxymethylcellulose, carboxymethylcellulose sodium, polyvinyl alcohol, polyvinyl

2  pyrrolidone, copolymer of methyl vinyl ether and maleic anhydride, gum arabic, tragacanth,

3  karaya gum and locust bean gum."

4       84.    The second Markush group related to "a water-retaining agent selected from the

5  group consisting of ethylene glycol, diethylene glycol, polyethylene glycol, glycerin, sorbitol,

6  martitol, propylene glycol and 1,3-butylene glycol."

7       85.    As the District Court held in its *Markman* decision construing those two patent

8  terms, Federal Circuit precedent from 2003 clearly established that both of the relevant Markush

9  groups in the '529 patent were limited to one and only one of the listed alternatives. *Endo*

10 *Pharm. Inc., et al., v. Watson Lab.*, Inc., slip op. at 1 n.1-2. Under Federal Circuit precedent, the

11 patent must be interpreted to cover a product which contains only one of the substances from each

12 of the two Markush groups.

13      86.    Watson's generic Lidoderm product contained at least four water-soluble high-

14 molecular-weight substances, and three water-retaining agents. (So does Lidoderm.) Thus, it did

15 not infringe the '529 patent because it contained more than one substance from each Markush

16 group. As a result, Watson's generic Lidoderm product did not infringe the '529 patent. The

17 '529 patent was not capable of preventing Watson from launching its approved generic Lidoderm

18 product.

19          **b.**    **The Rolf Patent Litigation**

20      87.    The Rolf patents afforded Endo/Teikoku no basis to prevent Watson from

21 launching its approved generic Lidoderm product, either. Endo/Teikoku sued Watson only on

22 some of the Rolf patents (the '510, '333, and '334 patents). Watson had raised defenses and

23 counterclaims alleging those patents were invalid and/or unenforceable and that its product did

24 not infringe them. Endo/Teikoku did not even bother to sue Watson on the '263 patent. The Rolf

25 Patent Litigation barely proceeded past the pleading stage. The Rolf patents posed no reasonable

26 risk to Watson of patent infringement liability.

27      88.    Of the Rolf patents, only the '510 patent had been asserted by its previous owner,

28 LecTec, against Endo with respect to its Lidoderm product in the LecTec Litigation in 2008. As

1   Endo/Teikoku learned from the LecTec Litigation, the '510 patent was subject to a strong

2   invalidity challenge.  The '510 patent was invalid as obvious in view of prior art references that

3   were not submitted to the PTO during the prosecution of the '510 patent.  Watson, too, was aware

4   of the infirmities of the '510 patent from the publicly filed pleadings in the LecTec Litigation.

5   The '510 patent was incapable of preventing Watson from launching its approved generic

6   Lidoderm product.

7        89.     The '333 and '334 patents were also not infringed by Watson.  Indeed, during the

8   LecTec litigation, LecTec had not even sued Endo for infringement of the '333 and '334 patents

9   with respect to Lidoderm.  When Endo ultimately settled the LecTec Litigation in November

10  2009, it obtained licenses only to the '263 and '510 patents, further demonstrating that licenses to

11  the '333 and '334 patents were irrelevant to the use, manufacture, or sale of Lidoderm.  Watson's

12  generic patch, a copy of the Endo patch, similarly would not infringe the '333 and '334 patents.

13       90.     Indeed, Endo did not bother to obtain the rights to the '333 and '334 patents until

14  May 2011, when it bought the rights to all of the Rolf patents from LecTec for just $2 million,

15  still further evidence that those patents were incapable of preventing Watson from launching its

16  approved generic Lidoderm product.  None of the Rolf patents was capable of preventing Watson

17  from launching its approved generic Lidoderm product.

18       **B.      Endo/Teikoku and Watson Enter the Unlawful Reverse Payment Agreement**

19       91.     On or about May 28, 2012 – after the February 2012 bench trial and as

20  Endo/Teikoku and Watson were awaiting a decision from Judge Sleet – Endo/Teikoku and

21  Watson entered into an agreement ending the patent litigation related to Lidoderm.  The Reverse

22  Payment Agreement ended the '529 Litigation and the Rolf Patent Litigation, and obviated the

23  need for Judge Sleet to render decisions on the validity, enforceability, and infringement of the

24  patents Endo/Teikoku had asserted against Watson.

25       92.     Under the Agreement, Watson agreed to delay launching its generic Lidoderm

26  product until a "Start Date" of September 15, 2013 unless before that date another generic

27  product launched (a virtual impossibility) or Watson faced forfeiture of its 180-day exclusivity for

28  failing to go to market (also a virtual impossibility).  The Agreement specifically provides:

22

COMPLAINT AND DEMAND FOR JURY TRIAL

1

2

3      Subject to Section 2(d), Watson agrees, on behalf of itself and its Affiliates, that,
prior to the Start Date, it and its Affiliates shall not directly or indirectly market,
offer to sell, sell, have sold, import, manufacture or have manufactured in the

4 Territory any of Watson's Generic Product. Watson acknowledges and agrees
that each of Endo and Teikoku would be irreparably harmed should Watson

5 breach this Section 2(e). Nothing in this Agreement shall prohibit or preclude
Watson from exercising its rights under 35 U.S.C. § 271(e)(1).[1] . . .

6

     "Start Date" means the earliest of: (i) September 15, 2013; (ii) the date of Launch

7 of any Generic Product other than Watson's Generic Product; or (iii) the last day
before Watson would forfeit its 180-day generic drug exclusivity with respect to

8 Watson's Generic Product due to the operation of 21 U.S.C. 355(j)(5)(D)(ii) as a
result of a forfeiture event under 21 U.S.C. 355(j)(5)(D)(i)(I).[2]

9

     93.     As one *quid pro quo* for Watson's promise to delay entry of its generic Lidoderm
10

product until September 15, 2013, Endo/Teikoku promised to share with Watson the monopoly
11

profits they would reap from Lidoderm's extended market exclusivity by paying Watson at least
12

$96 million (in the form of branded Lidoderm provided by Endo/Teikoku at no cost to Watson) at
13

the rate of $12 million per month from January 1, 2013 through August 1, 2013. Watson was free
14

to sell the brand Lidoderm product and retain the full proceeds of those sales. This payment was
15

no different than if Endo/Teikoku had made those sales themselves and paid Watson the resulting
16

$96 million in cash. The Agreement specifically provides:
17

18      Endo/Teikoku shall provide, **at no cost**, to Watson's Wholesaler Affiliate Brand
Product of value totaling **twelve million dollars ($12,000,000) per month**, as

19 measured at the time of each delivery by the then-prevailing Wholesale
Acquisition Cost as defined in the Red Book or, if the Red Book is not available,

20 any other comparable U.S. price listing ("WAC"), on the first business day of
each month beginning January 1, 2013 and ending August 1, 2013 (**for a total of**

21 **eight (8) months**) for Watson's Wholesaler Affiliate's disposal as provided in
Section 3(e). Endo shall provide to Watson's Wholesaler Affiliate an invoice

22 with respect to such Brand Product, which invoice shall reflect the transfer of
Brand Product to Watson's Wholesaler Affiliate at no cost. Notwithstanding the

23 foregoing, Endo/Teikoku's obligations under this Section 3(b) shall terminate
immediately upon the Launch of any Third Party Generic Product in the Territory.

24 The Brand Product provided to Watson's Wholesaler Affiliate by Endo/Teikoku
shall have the same NDC number as the Brand Product sold by Endo. In any

25 month in which Endo/Teikoku has provided to Watson's Wholesaler Affiliate any
Brand Product under this Section 3(b), and in which a Third Party has Launched a

26

27   [1]  Settlement Agreement at Section 2(e).

28   [2]  *Id.* at Section 1(v).

Generic Product in the Territory, Watson shall either (i) return to Endo a pro rata quantity of the Brand Product delivered by Endo/Teikoku during such month, or (ii) reimburse Endo in cash for the value of the Brand Product (based on the WAC measured at the time of delivery by Endo/Teikoku to Watson's Wholesaler Affiliate), in either case for the pro rata portion of the month on and after such Launch[.] . . . Such return or reimbursement shall be made by Watson to Endo within five (5) business days of the date of the Launch of a Generic Product in the Territory. [3] . . .

The Brand Product supplied by Endo/Teikoku to Watson's Wholesaler Affiliate under Sections 3(b) through (d) may be resold solely by Watson's Wholesaler Affiliate to Third Parties for use solely in the Territory on pricing and other terms determined by Watson's Wholesaler Affiliate in its sole discretion, provided that neither Watson nor any of its Affiliates (including its Wholesaler Affiliate) shall sell, distribute or dispose of Branded Product in any manner that would constitute a Bundled Sale. Watson agrees that its Wholesaler Affiliate will honor all Endo price-related contracts as communicated to all Endo wholesalers from time to time in the ordinary course of business, provided that the price related contracts do not impose any requirements on Watson's Wholesaler Affiliate that would be inconsistent with requirements imposed upon other Lidoderm® wholesalers, and further provided that such price-related contracts shall not conflict with the terms of this Agreement. Watson shall comply with all Applicable Laws in connection with its resale of the Brand Product.[4]

94.     Endo/Teikoku also agreed to make additional payments to Watson if Watson did not receive FDA approval for its generic Lidoderm product by January 1, 2014, as well as additional payments if Watson did not receive approval by January 1, 2015. Neither situation came to pass or was expected to come to pass: Watson received final FDA approval on August 23, 2012, within three (3) months of Defendants' execution of the Reverse Payment Agreement.

95.     As the Agreement expressly provided, this $96 million payment from Endo/Teikoku to Watson was expressly to induce Watson to quit its challenge to Endo/Teikoku's patents:

Endo/Teikoku and Watson agree that the Brand Product provided by Endo/Teikoku to Watson's Wholesaler Affiliate hereunder is a good-faith, bargained-for resolution of the claims at issue in the Litigation. The Brand Product provided hereunder is not contingent on any past or future purchase of any product from Endo or Teikoku by Watson or any of its Affiliates.[5]

---

[3] *Id.* at Section 3(b) (emphasis added).

[4] *Id.* at Section 3(e).

[5] *Id.* at Section 3(i).

COMPLAINT AND DEMAND FOR JURY TRIAL

96.     Through the Agreement, Defendants ensured that Watson's sales of Lidoderm would not result in price competition, but rather that Watson would sell brand Lidoderm at the same supracompetitive prices at which Endo had been selling it.  The Agreement provided that Watson would honor all of Endo's price-related contracts honored by Endo's wholesalers.  In fact, Watson maintained the supracompetitive prices for brand Lidoderm throughout the term of the Agreement, generating revenues and profits of close to $96 million from those sales. Watson's sales of branded Lidoderm did not increase output, reduce price, or increase consumer choice; it merely substituted Watson for Endo/Teikoku as the seller of $96 million worth of branded Lidoderm, solely to pay Watson for delaying market entry of its less-expensive generic Lidoderm.

97.     As a second payment in exchange for Watson's promise to delay entry of its generic Lidoderm product until September 15, 2013, Endo/Teikoku promised to delay launching an authorized generic version of Lidoderm for 7½ months after Watson's belated launch of generic Lidoderm, unless another ANDA filer entered the market during that time (a virtual impossibility that, in fact, did not occur).

98.     Endo/Teikoku was otherwise ready, willing, and able to launch an authorized generic version of Lidoderm simultaneously with Watson's launch.  As early as April 2007, Endo and Teikoku had specifically agreed that Endo would be the exclusive licensee for authorized generic Lidoderm.  As shown below, this no-authorized-generic promise effectuated a payment from Endo/Teikoku to Watson of $170 million or more.

99.     Endo/Teikoku's agreement not to launch an authorized generic meant that Endo/Teikoku would cede those sales to Watson, and Watson would therefore be the sole generic on the market for 7½ months.  This would allow Watson to obtain 100% of generic Lidoderm sales for 7½ months (instead of just 50% if Endo/Teikoku had launched an authorized generic) and additionally permitted Watson to avoid the inter-generic price competition an authorized generic necessarily creates and thereby maintain an artificially inflated, supracompetitive generic price for those doubled generic sales.  These doubled revenues and profits were at the expense of

COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiffs, consumers, and competition in general.  The Agreement (which refers to an authorized

generic by the acronym "AG") provides:

> License.  Subject to the terms and conditions of this Agreement, Endo/Teikoku hereby grant to Watson a non-exclusive (other than pursuant to Section 2(b)), royalty-bearing, non-transferable (other than pursuant to Section 21) and non-sublicensable (other than pursuant to Section 2(c)) license to the Licensed Patents to make, have made, import, use, sell, and offer for sale Watson's Generic product in the Territory solely during the License Term.[6] . . .

> AG Product. The license granted pursuant to Section 2(a) shall be partially exclusive for a period of time in that Endo/Teikoku and their respective Affiliates **shall not market or sell a Generic Product, or authorize or license a Third Party to market or sell an AG Product at any time before the earlier of (i) seven and a half (7.5) months from the Start Date**, and (ii) the Launch of any Third Party Generic Product in the Territory.[7]

100.    Endo/Teikoku's agreement not to launch an authorized generic for 7½ months

allowed Watson to double its unit sales and charge higher prices for its generic during that time

(because it faced no competition from an authorized generic), and had a cash value to Watson of

$170 million or more.

101.    Absent the Reverse Payment Agreement, and Endo/Teikoku's promise not to

launch an authorized generic contained therein, Endo/Teikoku would have launched an

authorized generic simultaneously with Watson's entry, which would have resulted in lower

prices to Plaintiffs and would have cut Watson's revenues and profits from selling generic

Lidoderm by at least half.

102.    In fact, at their first opportunity following the expiration of the no-authorized

generic promise, Endo/Teikoku immediately launched an authorized generic.

103.    The Reverse Payment Agreement contained a term whereby Watson agreed to pay

back to Endo/Teikoku a small (25%) portion of Watson's increased profits resulting from

Endo/Teikoku's agreement not to launch an authorized generic for 7½ months.  That term

provided:  "Beginning with the First Commercial Sale of Watson's Generic Product and until the

date of the occurrence of the First Commercial Sale by a Third Party or Endo/Teikoku or their

---

[6]  Settlement Agreement at Section 2(a).

[7]  *Id.* at Section 2(b) (emphasis added).

COMPLAINT AND DEMAND FOR JURY TRIAL

Affiliates of a Generic Product or AG Product in the Territory, Watson shall pay to Endo royalty payments equal to twenty-five percent (25%) of all Gross Profit of Watson's Generic Product."[8]

104.    This term providing for a 25% royalty back to Endo/Teikoku during the 7½ month period was window dressing for the parties' naked agreement not to compete during Watson's anticipated 180-day Hatch-Waxman exclusivity period. The royalty was designed merely to give the appearance of a legitimate, non-collusive transaction. In reality, Defendants simply agreed to lengthen the no-authorized generic promise's duration by 1½ months (from 6 months to 7½ months) in order to mitigate the royalty Watson would be paying to Endo/Teikoku.

105.    Plaintiffs' estimate that Endo/Teikoku's payment to Watson by the no-authorized generic promise amounted to $170 million or more already accounts for an assumed 25% royalty paid by Watson back to Endo/Teikoku.

106.    Endo/Teikoku sacrificed substantial revenues and profits by agreeing not to launch an authorized generic for 7½ months. Absent the Reverse Payment Agreement and the delay in generic Lidoderm competition it effectuated, it would have made economic sense for Endo/Teikoku to launch an authorized generic simultaneously with Watson's launch so that Endo/Teikoku could retain sales that Watson's less expensive generic otherwise would capture, rather than ceding those sales to Watson. As alleged above, an authorized generic product typically captures approximately 50% of the generic sales during first 180 days of generic marketing.

107.    The no-authorized-generic promise was a very large payment to Watson. Using a conservative approach that relies upon the revenue numbers that Endo reported in its filings with the Securities and Exchange Commission as an input for the annual revenue from Lidoderm, and valued as of the time the Reverse Payment Agreement was entered, Plaintiffs estimate that the no-authorized generic promise constituted a payment of $170 million or more from Endo/Teikoku to Watson. This figure is estimated by calculating the difference between Watson's expected revenues during the 7½ months free from competition from Endo/Teikoku's authorized generic

---

[8] *Id.* at Section 3(a).

COMPLAINT AND DEMAND FOR JURY TRIAL

1  and what Watson's revenues would have been during those 7½ months had Watson faced

2  competition from Endo/Teikoku's authorized generic. Both of these amounts can be estimated

3  using the known dynamics of the pharmaceutical industry and publicly-available information.

4       108.    The amount of revenue Watson would expect to earn from sales of generic

5  Lidoderm during the first 7½ months of marketing free from competition from Endo/Teikoku's

6  authorized generic can be estimated as follows:

7      a.    At the time Defendants entered the Agreement, Endo had reported that its annual

8      revenue from sales of Lidoderm in the prior year, 2011, was $825 million. Thus, at

9      the time of the Agreement, 7½ months of branded Lidoderm sales would generate

10      revenue to Endo/Teikoku of at least $515,625,000 (7.5/12 * 825,000,000).[9]

11      b.    As is common in the pharmaceutical industry, the first generic is expected to take

12      80% (or more) of the brand's unit sales within six months. Thus, approximately

13      $412,500,000 worth of brand unit sales would be converted to Watson's generic

14      during the first 7½ months Watson's generic Lidoderm was on the market

15      (515,625,000 * .8).

16      c.    As is also common, with only one generic on the market, the generic is typically

17      priced at 90% of the brand's pre-generic price, which would result in generic sales

18      revenues during the first 7½ months Watson was on the market of approximately

19      $371,250,000 (412,500,000 * .9). Thus, the sales revenues Watson would have

20      obtained during the 7½ months that the no-authorized-generic promise was in effect

21      were approximately $371,250,000.

22      d.    Under the Agreement, Watson agreed to pay Endo/Teikoku a royalty of 25% on

23      Watson's gross profits on sales of generic versions of Lidoderm during the 7½

24      month period that the no-authorized-generic promise was in effect. Conservatively

25      applying the royalty on $371,250,000 in sales (as opposed to the lower number that

26

27

28

---

[9] That number is conservative, as it does not account for any increase in sales achieved by Endo/Teikoku in 2012 and 2013, during the period of delayed generic Lidoderm competition purchased by Endo/Teikoku's payments to Watson. In fact, Endo/Teikoku's Lidoderm revenue rose from $825 million in 2011 to $947 million in 2012.

COMPLAINT AND DEMAND FOR JURY TRIAL

1  would reflect Watson's gross profits), and further assuming that royalties were

2  actually paid, this would amount to approximately $92,812,500 (371,250,000 *

3  .25). As a result, even when the amount of the royalty is subtracted out, Watson's

4  anticipated revenue during 7½ months free from competition from Endo/Teikoku's

5  authorized generic would be, conservatively, $278,437,500 (371,250,000 -

6  92,812,500).

7  109. Watson's dramatically smaller revenues if Endo/Teikoku had not promised to

8  refrain from launching an authorized generic for 7½ months following Watson's launch can be

9  estimated as follows:

10  a. According to an FDA study of the dynamics of generic competition, the addition of

11  a second generic (such as Endo/Teikoku's authorized generic) drives the average

12  generic price down to 52% of the brand price.[10] Thus, while the generics would

13  still take 80% of brand sales during those first 7½ months, or $412,500,000 at the

14  branded Lidoderm price, the dollar value of those generic sales would drop to

15  $214,500,000 in the presence of an authorized generic (412,500,000 * .52).

16  b. Watson would not get 100% of those revenues, however. That is because the unit

17  sales of the generic during those first 7½ months would be split evenly between

18  Watson's generic Lidoderm and Endo/Teikoku's authorized generic Lidoderm.[11]

19  (This is conservative because there is reason to expect that Endo/Teikoku may have

20  enjoyed a marketing advantage as the incumbent and could garner more than 50%

21  of unit sales.)

22

23

24  [10] Generic Competition and Drug Prices, http://www.fda.gov/AboutFDA/CentersOffices/
OfficeofMedicalProductsandTobacco/CDER/ucm129385.htm (last accessed January 19, 2015).

25  [11] *Id.* at vi (The Federal Trade Commission has concluded that, when free from competition from

26  an authorized generic, "the first-filer's revenue will approximately double" during the first six
months of generic competition, compared to what the first filer would make if it faced authorized

27  generic competition.). The Supreme Court has recognized this as well. See *Federal Trade
Comm'n v. Actavis, Inc.*, 133 S. Ct. 2223, 2229 (2013) (the "vast majority of potential profits for

28  a generic drug manufacturer materialize during" the first six months of marketing).

COMPLAINT AND DEMAND FOR JURY TRIAL

1      c.    Thus, without Endo/Teikoku's no-authorized-generic promise, Watson's revenues
2         from sales of generic Lidoderm during the first 7½ months of generic marketing
3         would have been approximately $107,250,000 (214,500,000 * .5).

4      110.    The incremental revenue that Endo/Teikoku paid to Watson through the no-authorized generic promise is therefore $171,187,500 (278,437,500 - 107,250,000). That amount is the payment that Endo/Teikoku made to Watson by way of the no-authorized generic promise contained in the Reverse Payment Agreement. This estimate assumes that, rather than Defendants' entering an agreement that allowed Watson to enter without Endo/Teikoku paying Watson to delay its entry, Watson would have entered the market "at risk" in the "but-for world" (i.e., in a world absent the reverse payments challenged by this lawsuit).

111.    Alternatively, had the parties settled the patent litigation without Endo/Teikoku paying Watson to delay entry of its generic Lidoderm, and assuming a term in that agreement requiring Watson to pay a royalty of 25% during the first 7½ months of Watson's generic marketing, the royalty on those sales would be $26,812,500 (107,250,000 * .25). Thus, net of royalties, the revenue Watson would have realized during the first 7½ months of marketing from an earlier licensed entry with competition from Endo/Teikoku's authorized generic would be $80,437,500 (107,250,000 - 26,812,500).

112.    The incremental revenue that Endo/Teikoku paid to Watson by the no-authorized generic promise is therefore approximately $198,000,000 (278,437,500 - 80,437,500). That amount is the payment that Endo/Teikoku made to Watson by way of the no-authorized-generic promise contained in the Reverse Payment Agreement. This second estimate assumes that, rather than Watson entering the market at risk, Defendants would have entered into an agreement that allowed Watson to enter without Endo/Teikoku paying Watson to delay its entry in the "but-for world" (i.e., in a world absent the reverse payments challenged by this lawsuit).

113.    Thus, Endo/Teikoku's agreement not to launch an authorized generic version of Lidoderm for 7½ months was a payment to Watson of at least $170 million and possibly $198 million or more. And, given that Lidoderm revenues increased significantly to $947 million in 2012, the size of the payment almost certainly increased by the time Watson ultimately received it

1  in September of 2013, when Watson belatedly launched without competition from Endo/
2  Teikoku's authorized generic.

3      114.    The total payment flowing from Endo/Teikoku to Watson, including both the $96
4  million in free goods and Endo/Teikoku's promise to delay launching an authorized generic
5  version of Lidoderm for 7½ months had a cash value in the hundreds of millions of dollars.
6  Although Plaintiffs do not have the burden of production or of proof on Defendants' affirmative
7  defenses by so doing, Plaintiffs nevertheless allege that Defendants can offer no cognizable,
8  nonpretextual justification or explanation for the reverse payments.  The reverse payments are far
9  greater than Endo/Teikoku's avoided litigation costs, and were not for services to be provided by
10 Watson to Endo/Teikoku.  Rather, the reverse payments were made in order to induce Watson to
11 stay out of the lidocaine patch 5% market until September of 2013 and to allow Defendants to
12 share monopoly profits.

13     115.    These large, unjustified payments have no rational connection to, and far exceed,
14 any approximation of the costs of continuing the patent litigation. Moreover, Defendants are
15 unable to establish that either payment was consideration for the fair value of any services
16 provided by Watson to Endo/Teikoku. Indeed, Watson was not required to perform any services
17 in exchange for the unlawful payment according to the Reverse Payment Agreement.  Watson
18 provided no value to Endo/Teikoku under the Agreement other than an impermissible agreement
19 to delay competition.  The Agreement was not a distribution agreement, and Endo had no need
20 for any such services for Lidoderm in any event.

21     116.    Absent Endo/Teikoku's unlawful reverse payments to Watson, any agreement
22 settling the patent litigation would have permitted Watson to enter the market much earlier than
23 the date agreed to as a result of the payments.  But for the reverse payments, Watson would have
24 launched much earlier than September 2013, either under an agreement without any reverse
25 payments, or at risk after final approval.  And, in either circumstance, Watson's entry would have
26 been immediately met with Endo/Teikoku's authorized generic.

27

28

### C.     Anticompetitive Purpose and Effect of Defendants' Conduct

117.    The unlawful Reverse Payment Agreement enabled Defendants to:  (a) delay the entry of less expensive generic versions of Lidoderm products in the United States for up to 13 months; (b) delay the introduction of an authorized generic lidocaine patch 5% for 7½ months, which otherwise would have appeared on the market coincident with initial generic competition; (c) fix, raise, maintain or stabilize the price of lidocaine patch 5% products; (d) maintain a monopoly in the U.S. market for lidocaine patch 5% products; (e) allocate 100% of the United States market for lidocaine patch 5% to Endo/Teikoku for up to 13 months; and (f) allocate 100% of United States sales of generic lidocaine patch 5% to Watson for 7½ months.

118.    But for the unlawful Agreement:  (a) Watson would have begun selling its generic version of Lidoderm when it received FDA approval on August 23, 2012 or shortly thereafter, either "at risk" or pursuant to an agreement with Endo/Teikoku that did not include a reverse payment; and (b) Endo/Teikoku would have launched an authorized generic lidocaine patch 5% simultaneously with Watson's earlier entry.

119.    Watson would have launched its generic product notwithstanding any patents that Endo/Teikoku may have claimed covered Lidoderm, prior to resolution of the '529 Litigation, and prior to resolution of the Rolf Patent Litigation.  None of the patents other than the '529 patent was even listed in the Orange Book when Watson filed its ANDA.  Thus, Watson was not required to certify to any other patents under Hatch-Waxman, and any litigation filed over those other patents would not, and could not, result in a 30 month Hatch-Waxman stay of FDA approval of Watson's ANDA.  Furthermore, given the obvious defects in the '529 patent and Rolf patents, Watson would have launched upon final FDA approval even in the absence of a court ruling on those patents.  Once Watson obtained FDA approval of its ANDA, it was free to launch, and but for the unlawful reverse payments, Watson would have launched its generic Lidoderm immediately, and Endo/Teikoku would have launched an authorized generic simultaneously.

120.    Watson told Wall Street analysts in late 2011 and early 2012 that it was pursuing its ANDA, that it was closely monitoring the progress of the ANDA and expected approval in

COMPLAINT AND DEMAND FOR JURY TRIAL

2012, that its efforts to increase capacity were well underway, and it expected to be "ready to go at the earliest possible time to launch the product."

121.    Alternatively, but for the unlawful reverse payments Endo/Teikoku and Watson would have entered into a procompetitive settlement agreement under which Endo/Teikoku would not have paid Watson for delay, Watson would have entered the market much earlier than September of 2013, and Endo/Teikoku would have simultaneously launched an authorized generic lidocaine patch 5%.

122.    Defendants' unlawful actions have delayed the sale of generic Lidoderm in the United States, delayed the sale of an authorized generic Lidoderm in the United States, and unlawfully enabled Endo/Teikoku, and then Watson, to sell lidocaine patch 5% at artificially inflated, supracompetitive prices. But for Defendants' illegal conduct, generic competition to Lidoderm would have begun prior to September 15, 2013, and would have included both Watson's generic Lidoderm product as well as Endo/Teikoku's authorized generic Lidoderm.

## VI.    INTERSTATE COMMERCE

123.    The drugs at issue in this case are sold in interstate commerce. Defendants' unlawful activities, as alleged above, have occurred in, and have had a substantial impact on, interstate commerce.

## VII.    MONOPOLY POWER AND MARKET DEFINITION

124.    At all relevant times, Endo had market and/or monopoly power over lidocaine patch 5% because it had the power to maintain lidocaine patch 5% prices at supracompetitive levels without losing substantial sales to other products prescribed and/or used for the same purposes as Lidoderm, with the exception of AB-rated generic versions of Lidoderm.

125.    A small but significant, non-transitory price increase to Lidoderm by Endo would not have caused a significant loss of sales to drug products other than AB-rated generic versions of Lidoderm.

126.    Lidoderm does not exhibit significant, positive cross elasticity of demand with respect to price with any product other than AB-rated generic versions of Lidoderm.

127.    Because of, among other reasons, its approved indication, Lidoderm is differentiated from all products other than AB-rated generic versions of Lidoderm.

128.    Endo needed to control only Lidoderm and its AB-rated generic equivalents, and no other products, in order to maintain the price of Lidoderm profitably at supracompetitive prices.  Only the market entry of a competing, AB-rated generic version of Lidoderm would render Endo unable to profitably maintain its supracompetitive prices for Lidoderm without losing substantial sales.

129.    Endo sold Lidoderm at prices well in excess of marginal costs, and in excess of the competitive price, and enjoyed high profit margins.

130.    Endo had, and exercised, the power to exclude and restrict competition to Lidoderm and its AB-rated generics.

131.    Endo/Teikoku's reverse payments to Watson demonstrate that Endo enjoyed market and/or monopoly power with respect to lidocaine patch 5%.

132.    Endo, at all relevant times, enjoyed high barriers to entry with respect to competition to the above-defined relevant product market due to patent and other regulatory protections and high costs of entry and expansion.

133.    To the extent that Plaintiffs may be legally required to prove market and/or monopoly power circumstantially by first defining a relevant product market, Plaintiffs allege that the relevant market is lidocaine patch 5% (i.e., Lidoderm and its AB-rated generic equivalents). During the period relevant to this case, Endo was able to profitably maintain the price of lidocaine patch 5% well above competitive levels.

134.    The relevant geographic market is the United States, including its territories, possessions and the Commonwealth of Puerto Rico.

135.    Prior to September 15, 2013, Endo's market share in the relevant market was 100%, implying a substantial amount of market power.

## VIII.    EFFECT ON COMPETITION AND DAMAGES

136.    Watson's ANDA was approved August 23, 2012.  Were it not for the unlawful reverse payments and Reverse Payment Agreement alleged herein, Watson would have entered

34

the market on or shortly after that date.  One or more generic Lidoderm products would have entered the market well before the date provided in Defendants' unlawful Reverse Payment Agreement, September 15, 2013.

137.    But for the unlawful Reverse Payment Agreement, an authorized generic version of Lidoderm would have been available on the market simultaneously with the launch of Watson's generic.

138.    Defendants' unlawful reverse payments and Reverse Payment Agreement delayed generic Lidoderm competition and unlawfully enabled Endo to sell Lidoderm without generic competition.  But for Defendants' illegal conduct, one or more generic competitors would have begun marketing AB-rated generic versions of Lidoderm on August 23, 2012 or shortly thereafter, and in any event, earlier than September 15, 2013.

139.    Watson has extensive experience in the pharmaceutical industry, including in obtaining approval for ANDAs, marketing generic pharmaceutical products, and manufacturing commercial launch quantities adequate to meet market demand.

140.    Defendants' unlawful Reverse Payment Agreement, which delayed introduction of generic versions of Lidoderm in the United States, has caused Plaintiffs and/or their assignors to pay more than they would have paid for lidocaine patch 5%.

141.    But for Defendants' unlawful Agreement, Plaintiffs and/or their assignors would have paid less for lidocaine patch 5% by (a) substituting purchases of less-expensive AB-rated generic Lidoderm for their purchases of more-expensive brand Lidoderm, and/or (b) purchasing generic Lidoderm at lower prices sooner.

142.    Thus, Defendants' unlawful conduct deprived Plaintiffs and/or their assignors of the benefits of competition that the antitrust laws were designed to protect.

143.    During the relevant period, Plaintiffs and/or their assignors purchased substantial amounts of Lidoderm directly from Endo and purchased substantial amounts of generic Lidoderm directly from Watson.  As a result of Defendants' illegal conduct as alleged herein, Plaintiffs and/or their assignors were compelled to pay, and did pay, artificially inflated prices for their lidocaine patch 5% requirements.  Plaintiffs and/or their assignors paid prices for lidocaine patch

35

5% that were substantially greater than the prices that they would have paid absent the illegal conduct alleged herein, because: (1) Plaintiffs and/or their assignors were deprived of the opportunity to purchase lower-priced generic Lidoderm instead of more expensive brand Lidoderm; and (2) Plaintiffs and/or their assignors paid artificially inflated prices for generic lidocaine patch 5%.

144.    As a consequence, Plaintiffs and/or their assignors have sustained substantial losses and damage to their business and property in the form of overcharges, the exact amount of which will be the subject of proof at trial.  Plaintiffs' injury is injury of the type the antitrust laws were designed to prevent and flows from that which makes Defendants' acts unlawful.

145.    Defendants' conduct threatens continuing loss and damage to Plaintiffs unless enjoined by this Court.

**XI.  CLAIMS FOR RELIEF**
**Claim I: Violation of 15 U.S.C. § 1**
**(Conspiracy in Restraint of Trade)**

146.    Plaintiffs incorporate by reference the allegations in paragraphs 1 through 145 above as though fully set forth herein.

147.    Defendants have engaged in an unlawful contract, combination, or conspiracy that has unreasonably restrained trade or commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

148.    In or about May 2012 and at times prior to the formal execution thereof Defendants entered into the Reverse Payment Agreement, an illegal contract, combination and conspiracy in restraint of trade under which Endo/Teikoku agreed to make large reverse payments to Watson in exchange for Watson's agreement to delay bringing its generic version of Lidoderm to the market for up to 13 months, the purpose and effect of which were to: (a) allocate 100% of the market for lidocaine patch 5% in the United States, including its territories, possessions and the Commonwealth of Puerto Rico, to Endo; (b) delay the availability of generic versions of Lidoderm in the United States, including its territories, possessions and the Commonwealth of Puerto Rico, thereby protecting Lidoderm from any generic competition; (c) delay the entry of Endo/Teikoku's authorized generic until 7½ months after Watson's entry with a generic

Lidoderm product, and allocate 100% of sales for generic lidocaine patch 5% in the United States, to Watson prior to that time; and (d) fix, at supracompetitive levels, the price which direct purchasers would pay for lidocaine patch 5%.

149.     The Agreement was likely to have a substantially adverse effect on competition in the relevant market and is unlawful under the rule of reason.

150.     In the alternative, the Agreement constitutes a horizontal market allocation agreement which allocated the market temporally rather than geographically and is unlawful *per se*.[12]

151.     There is and was no legitimate, non-pretextual, precompetitive justification for the payment from Endo/Teikoku to Watson that outweighs its harmful effect.  Even if there were some conceivable such justification, the payment was not necessary to achieve, nor the least restrictive means of achieving, such a purpose.

152.     As a direct and proximate result of Defendants' agreement in restraint of trade, as alleged herein, Plaintiffs were harmed and suffered overcharge damages as set forth above.

**Claim II: Violation of 15 U.S.C. § 2**
**(Conspiracy to Monopolize)**

153.     Plaintiffs incorporate by reference the allegations in paragraphs 1 through 145 above as though fully set forth herein.

154.     At all relevant times, Endo possessed substantial market power (i.e., monopoly power) in the relevant market.  Endo possessed the power to control prices in, prevent prices from falling in, and exclude competitors from, the relevant market.

155.     Through the Reverse Payment Agreement, Endo/Teikoku and Watson conspired to maintain Endo's monopoly power in the relevant market in order to block and delay market entry of generic Lidoderm.

---

[12]     This allegation is included solely to preserve Plaintiffs' appellate rights.  Plaintiffs understand that the Court has rejected the contention that Defendants' agreement is unlawful *per se* (Case No. 14-md-2521, ECF Doc. 117, at 26-27) and do not dispute that the Court would reach the same result in this case.

COMPLAINT AND DEMAND FOR JURY TRIAL

156.    The Reverse Payment Agreement (a) allocated 100% of the market for lidocaine patch 5% in the United States, including its territories, possessions and the Commonwealth of Puerto Rico, to Endo; (b) delayed the availability of generic versions of Lidoderm in the United States, including its territories, possessions and the Commonwealth of Puerto Rico, thereby protecting Lidoderm from any generic competition; (c) delayed the entry of Endo/Teikoku's authorized generic until 7½ months after Watson's entry with a generic Lidoderm product, and allocate 100% of sales for generic lidocaine patch 5% in the United States, including its territories, possessions and the Commonwealth of Puerto Rico, to Watson prior to that time; and (d) fixed, at supracompetitive levels, the price which direct purchasers would pay for lidocaine patch 5%.

157.    The goal, purpose and/or effect of the Agreement was to maintain and extend Endo's monopoly power in the United States market in the market for lidocaine patch 5%, in violation of Sherman Act Section 2, 15 U.S.C. § 2.  The Agreement was intended to and did prevent and/or delay generic competition to Lidoderm and enabled Endo to continue charging supracompetitive prices for Lidoderm without a substantial loss of sales.

158.    Defendants knowingly and intentionally conspired to maintain and enhance Endo's monopoly power in the relevant market.

159.    Defendants specifically intended that their Agreement would maintain Endo's monopoly power in the relevant market, and injured Plaintiffs thereby.

160.    As a direct and proximate result of Defendants' concerted monopolistic conduct, as alleged herein, Plaintiffs were harmed and suffered overcharge damages as set forth above.

### Claim III: Violation of 15 U.S.C. § 2
### (Monopolization)

161.    Plaintiffs incorporate by reference the allegations in paragraphs 1 through 145 above as though fully set forth herein.  This claim is asserted against Endo only.

162.    At all relevant times, Endo possessed substantial market power (i.e., monopoly power) in the relevant market.  Endo possessed the power to control prices in, prevent prices from falling in, and exclude competitors from the relevant market.

38

163.    Through the anticompetitive conduct, as alleged extensively above, Endo willfully maintained its monopoly power in the relevant market using restrictive or exclusionary conduct, rather than by means of greater business acumen, and injured Plaintiffs thereby.

164.    It was Endo's conscious objective to further their dominance in the relevant market by and through the anticompetitive conduct alleged herein.

165.    Endo's anticompetitive conduct harmed competition as alleged herein.

166.    As a direct and proximate result of Endo's illegal and monopolistic conduct, as alleged herein, Plaintiffs were harmed and suffered overcharge damages as set forth above.

**Claim IV: Violation of 15 U.S.C. § 2**
**(Attempt to Monopolize)**

167.    Plaintiffs incorporate by reference the allegations in paragraphs 1 through 148 above as though fully set forth herein. This claim is asserted against Endo only.

168.    Through the Reverse Payment Agreement, Endo specifically intended to maintain monopoly power in the relevant market. It was Endo's conscious objective to control prices and/or to exclude competition in the relevant market.

169.    The natural and probable consequence of Endo's anticompetitive conduct, which was intended by Endo, and plainly foreseeable to Endo, was to control prices and exclude competition in the relevant market.

170.    There was a substantial and real chance, a reasonable likelihood, and/or a dangerous probability that Endo would succeed in and achieve its goal of maintaining monopoly power in the relevant market.

171.    As a direct and proximate result of Endo's illegal and monopolistic conduct, Plaintiffs were harmed and suffered overcharge damages as set forth above.

**IX.    DEMAND FOR JUDGMENT**

WHEREFORE, Plaintiffs respectfully request that the Court enter judgment against the Defendants and grant the following relief:

A.  A declaration that the conduct alleged herein is in violation of Sections 1 and 2 of the Sherman Act;

39

B. Permanent injunctive relief enjoining Defendants from continuing their illegal conduct and requiring them to take affirmative steps to dissipate the continuing effects of their prior conduct;

C. An award of Plaintiffs' overcharge damages, in an amount to be determined at trial, trebled;

D. An award of Plaintiffs' costs of suit, including reasonable attorneys' fees as provided by law; and

172. Such other and further relief as the Court deems just and proper.

## X.   JURY DEMAND

Plaintiffs demand a trial by jury on all issues so triable.

Respectfully submitted,

Dated: March 5, 2015

/s/ Anna T. Neill
Anna T. Neill
Kenny Nachwalter P.A.
1100 Miami Center
201 South Biscayne Boulevard
Miami, FL 33131
Telephone: (305) 373-1000
Facsimile: (305) 372-1861
Email: aneill@knpa.com
*Attorneys for Plaintiffs*

Of counsel:

Scott E. Perwin
Lauren C. Ravkind
Kenny Nachwalter P.A.
1100 Miami Center
201 South Biscayne Boulevard
Miami, FL 33131
Telephone: (305) 373-1000
Facsimile: (305) 372-1861
Email: sperwin@knpa.com
Email: lravkind@knpa.com

COMPLAINT AND DEMAND FOR JURY TRIAL